## AFFIDAVIT OF SPECIAL AGENT TYLER J. SACKETT

I, Tyler J. Sackett, Special Agent with the Federal Bureau of Investigations ("FBI"), being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am a Special Agent employed by the FBI. I have been a Special Agent with the FBI since September 2018.  I am currently assigned to the Boston Field Office, Lowell Resident Agency.  I am assigned to work criminal matters to include investigations focused on transnational organized crime, threats to life, violent gangs, drug trafficking, and violent crimes against children. Prior to my current assignment I attended the FBI Academy in Quantico, Virginia for approximately six months where I received extensive training in the area of federal criminal and constitutional law, investigative methods, and evidence collection.  I am a graduate of the United States Naval Academy where I received my bachelors of science in Political Science, American Politics and Law. Prior to my current employment, I was an Infantry Officer in the United States Marine Corps.

2.      As an FBI Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.  During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

3.      I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  In my training and experience, I

1

have observed and examined cocaine, cocaine base ("crack"), heroin, fentanyl, oxycodone, and other controlled substances.  I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the street terms used in their trade.

4.    I have participated in various aspects of drug-related investigations.  I have participated in controlled purchases of controlled substances utilizing confidential sources and undercover law enforcement agents and officers.  I have prepared affidavits for federal court– in support of applications for criminal complaints, search warrants, and tracking warrants.  I have also conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances.

5.    Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities.  Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking.  I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."  I also am familiar with the manner in which drug traffickers use telephones, coded or slang-filled conversations, text messages, pager messages, and other means to facilitate their illegal activities and prevent detention.

6.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended

to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.      One purpose of applying for this warrant is to determine with precision the location of cellular telephone assigned call number 978-983-1537 (hereinafter, the Target Cellular Device). However, there is reason to believe the Target Cellular Device is currently located somewhere within this district because cell-site data obtained for the Target Cellular Device indicated that it was normally to be found in this district.  Pursuant to Rule 41(b)(2), law enforcement may locate the Target Cellular Device outside the district provided the device is within the district when the warrant is issued.

8.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of : (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses") have been committed, are being committed, and will be committed by **Steven PEREZ, a/k/a "Stick," and Anthony HOLLOWAY**.  There is also probable cause to believe that the location of the Target Cellular Device will constitute evidence of those criminal violations, including leading to the identification of individuals who are engaged in the commission of these offenses and identifying locations where the target engages in criminal activity.

9.      Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41.  See 18

U.S.C. §§ 3121-3127.  This warrant therefore includes all the information required to be included in a pen register order.  See 18 U.S.C. § 3123(b)(1).

## BACKGROUND OF THE INVESTIGATION

1.      Since August 2019, the FBI, Lowell Resident Agency ("RA") and Methuen Police Department have been investigating PEREZ and his distribution of controlled substances in the Methuen, Lawrence, Dracut and Lowell areas of Massachusetts, known as the Merrimack Valley Region of Massachusetts. **On August 14, 2019**, an FBI CI[1] provided information that a person known as "Stick" was dealing drugs in Methuen. Based on the information provided by the CI, officers' surveillance described below, consensual audio and video recordings made by the CI, law enforcement databases, and prior law enforcement encounters, investigators identified "Stick" as PEREZ.

2.      **Between September 5, 2019, and October 10, 2019**, the FBI CI conducted six controlled purchases of narcotics from PEREZ and HOLLOWAY.  Prior to each controlled purchase, the CI called PEREZ and ordered varying quantities of heroin and/or fentanyl. Not all of the phone calls setting up the controlled purchases were recorded or monitored. On each occasion, the CI contacted PEREZ using the Target Cellular Device. All of the personal meetings during the controlled purchases were audio and/or video recorded and monitored by investigators.

---

[1] The CI has a history of assault and battery, receiving stolen property, and drug arrests and convictions. The CI has no current or pending charges. The CI was cooperating with law enforcement for monetary compensation. Around October 17, 2019, the FBI terminated its relationship with the CI after agents observed the CI's vehicle in the area of 36 Oakland Avenue on October 16, 2019 without express permission or at the direction of investigators. When confronted, the CI reported that the CI had purchased one prescription pill from an individual known only by his street name.  No further illegal activity was observed. Agents have corroborated information received from the CI as detailed below, all controlled purchases were audio and video recorded, and I believe that the information received from the CI is reliable.

After each of the phone calls setting up the controlled purchases, PEREZ and/or HOLLOWAY met with the CI to deliver the drugs that had been ordered.  Prior to and immediately following each controlled purchase, investigators searched the CI and the CI's vehicle for contraband with negative results.  Investigators also conducted contemporaneous physical surveillance of the meetings to the extent possible.

## **PROBABLE CAUSE**

September 5, 2019: Controlled purchase of suspected fentanyl from PEREZ inside

Target Location #1

3.      **On September 5, 2019**, under the supervision and direction of the FBI, the CI conducted a controlled purchase of $50 worth of crack cocaine and $50 worth of suspected heroin/fentanyl from PEREZ. Prior to meeting with agents, the CI placed an order for $50 worth of crack cocaine and $50 worth of heroin/fentanyl with PEREZ.  Agents then provided the CI with $100 in official agency funds. In the presence of agents, the CI called PEREZ, who told the CI to meet behind the Sunoco Gas Station on Broadway in Lawrence.  **At 5:57 p.m.**, investigators followed the CI to the area of the Sunoco Gas Station on Broadway in Lawrence.

4.      **At 6:05 p.m.**, surveillance officers observed an adult male wearing a black shirt and black pants approach the passenger side door of the CI's vehicle and open the door. The CI knew this individual only as "Jay." Inside the vehicle, the CI exchanged $50 for three bags of suspected crack cocaine. Jay told the CI that he did not have the "brown," a common street term for heroin/fentanyl, but that "Stick" had the "brown." Shortly thereafter, Jay departed the CI's vehicle. **At 6:06 p.m.**, the CI departed the Sunoco Gas Station and drove to the predetermined

meeting location followed by surveillance officers. There, the CI provided agents three small plastic bags containing crack cocaine.

5.      The CI then called PEREZ to ask PEREZ about the "brown." PEREZ told the CI to go to **36 Oakland Avenue, Apartment 16, Methuen, Massachusetts** (hereinafter, Target Location #1) to get it. **At 6:32 p.m.**, the CI drove to the area of Target Location #1. **At 6:38 p.m.**, the CI entered **Target Location #1**. Inside, the CI exchanged $50 for a bag of suspected fentanyl from PEREZ. **At 6:45 p.m.**, the CI exited **Target Location #1** and proceeded directly to the predetermined meeting location where the CI provided agents one small plastic bag containing a brown substance. The DEA Laboratory has tested the crack and confirmed it contains cocaine base; the suspected fentanyl is pending lab analysis but was field tested using a TRUNARC system and tested positive for fentanyl compound or methamphetamine.

<u>September 11, 2019: Controlled purchase of suspected fentanyl from PEREZ and HOLLOWAY in the vicinity of Target Location #2</u>

6.      **On September 11, 2019**, the CI conducted a controlled purchase of one "finger" (meaning 10 grams) of heroin/fentanyl from HOLLOWAY, at the direction of PEREZ. Before meeting agents, the CI called PEREZ and was directed to call back in one hour to set up a meeting location. Agents then provided the CI with $250 in official agency funds. In the presence of agents, the CI called PEREZ and PEREZ directed the CI to meet at 301 Pleasant Street, Dracut, Massachusetts, a Hannaford Supermarket which is a five to ten minute walk to 367 Hildreth Street, Apartment 22, Lowell, Massachusetts (hereinafter, Target Location #2).  **At 5:54 p.m.**, the CI drove to the Hannaford Supermarket.

7.      **At 6:23 p.m.**, the CI called PEREZ and PEREZ advised the CI that someone named Tony would meet the CI, and provided a description of Tony. Upon reviewing video of the

6

controlled purchase, investigators identified Tony as Anthony HOLLOWAY through prior law enforcement encounters and photographs of HOLLOWAY from law enforcement databases. PEREZ described what HOLLOWAY was wearing to the CI and stayed on the phone with the CI until HOLLOWAY arrived to the CI's vehicle. **At 6:24 p.m.**, surveillance officers observed HOLLOWAY approach the passenger side door of the CI's vehicle, open the door, and enter the CI's vehicle. The CI paid HOLLOWAY $250 and HOLLOWAY provided the CI a cylinder of brown powdery substance. The CI then drove to the back of the Hannaford Supermarket where HOLLOWAY exited the vehicle. Shortly thereafter, surveillance officers observed HOLLOWAY walking on Hildreth Street in Lowell away from Hannaford in the direction of **Target Location #2. At 6:25 p.m.**, the CI departed and drove to the predetermined meeting location, where the CI provided agents with the suspected drugs. Agents then field tested using a TRUNARC system and the brown substance tested positive for fentanyl compound or methamphetamine; lab analysis is pending.

September 18, 2019: Controlled purchase of suspected fentanyl from PEREZ and HOLLOWAY and surveillance of **Target Location #2**

8.      **On September 18, 2019**, the CI conducted a controlled purchase of one "finger" (meaning 10 grams) of heroin/fentanyl from HOLLOWAY at the direction of PEREZ. Prior to meeting agents, the CI called PEREZ who said to call again to coordinate a meeting location. Agents provided the CI with $250 in official agency funds. In the presence of agents, the CI sent a text message to PEREZ and was provided with the location 301 Pleasant Street in Dracut, the Hannaford Supermarket. **At 6:09 p.m.**, the CI drove to the Hannaford Supermarket. **At 6:19 p.m.**, the CI sent a text message to PEREZ stating that the CI was five minutes away. **At 6:20 p.m.**, the

CI called PEREZ and confirmed the meeting location. At 6:22 p.m., surveillance officers observed HOLLOWAY exit the building of **Target Location #2**.

9.      **At 6:22 p.m.**, the CI arrived at the Hannaford Supermarket. **At 6:25 p.m.**, surveillance officers observed HOLLOWAY walk across the Hannaford parking lot. **At 6:27 p.m.**, HOLLOWAY entered the CI's vehicle. The CI paid HOLLOWAY $250 and received a cylinder of brown powdery substance. HOLLOWAY requested that the CI provide HOLLOWAY with a "bump," meaning a small dose of the heroin/fentanyl he just provided. The CI provided a small dose of the heroin/fentanyl to HOLLOWAY. (When the CI later met with agents, agents admonished the CI for this conduct and instructed the CI that it was not permissible.). The CI then drove HOLLOWAY to a liquor store across from the Hannaford Supermarket where HOLLOWAY exited the vehicle. Shortly thereafter, surveillance officers observed HOLLOWAY exit the liquor store and walk on Hildreth Street towards the area of **Target Location #2**. **At 6:30 p.m.**, the CI drove to the predetermined meeting location, where the CI provided agents with the suspected drugs.  The drugs were field tested using a TRUNARC system and the brown substance tested positive for fentanyl compound or methamphetamine; lab analysis is pending

September 25, 2019: Controlled purchase of suspected fentanyl from PEREZ and surveillance of

**Target Location #1**

10.     **On September 25, 2019**, the CI conducted a controlled purchase of one "finger" (10 grams) of heroin/fentanyl from PEREZ.  **At 5:58 p.m.**, the CI called PEREZ and was directed to go to Target Location #1 for the previously arranged fentanyl deal. Agents then provided the CI with $250 and at 6:18 p.m., the CI drove to the area of **Target Location #1**. **At 6:22 p.m.**, surveillance officers observed the CI arrive and enter the building of **Target Location #1**. Inside,

the CI paid PEREZ $250 and PEREZ gave the CI one clear plastic bag containing a brown substance.

11.     **At 6:26 p.m.**, surveillance officers observed the CI exit the building of **Target Location #1**, return to the CI's vehicle, and drive to the predetermined meeting location, where the CI provided agents one small clear plastic bag containing a brown substance. The drugs field tested positive for fentanyl compound or methamphetamine; lab analysis is pending.

12.     Investigators maintained surveillance of the building of **Target Location #1**, and at **6:29 p.m.**, they observed PEREZ exit with a black bag and enter a grey Acura sedan (bearing New Hampshire registration 4587453, a vehicle investigators knew to be used by PEREZ) and depart. **At 6:37 p.m.**, PEREZ arrived at O&M Towing at 354 Water Street in Lawrence. Two individuals approached the vehicle and subsequently PEREZ departed O&M Towing. Shortly thereafter, surveillance was discontinued due to PEREZ utilizing what appeared to be counter-surveillance and law enforcement detection techniques such as taking illogical routes, making frequent stops, and circling the block.

<u>October 3, 2019: Controlled purchase of suspected fentanyl from PEREZ and surveillance of **Target Location #1**</u>

13.     **On October 3, 2019**, the CI conducted a controlled purchase of one "finger" (10 grams) of heroin/fentanyl from PEREZ.  Before meeting agents, the CI called PEREZ and PEREZ told the CI he was at a barbershop and told the CI to call back later when PEREZ would be at **Target Location #1** for the transaction. Agents provided the CI with $250 in official agency funds. **At 5:33 p.m.**, the CI attempted to contact PEREZ. However, PEREZ did not pick up the phone. **At 5:57 p.m.**, the CI called an associate of PEREZ, known only as Jay, to tell Jay to have PEREZ call the CI. Jay told the CI that PEREZ was around, meaning in the area of **Target Location #1**.

**At 6:28 p.m.**, the CI drove to the area of Target Location #1. **At 6:35 p.m.**, the CI entered Target Location #1 and observed three other males (including Francis Covey), one of whom asked the CI to go to a different room so that they could mix the drugs. Shortly thereafter, the CI saw PEREZ arrive with two unidentified Hispanic males. PEREZ and the CI then went into the bathroom where the CI provided PEREZ with the $250 and PEREZ gave the CI one plastic bag containing a brown powdery substance. Prior to the CI departing, HOLLOWAY arrived at **Target Location #1.**

14.     **At 7:08 p.m.**, the CI departed, drove to a pre-determined location, and provided agents the suspected drugs, which were field tested and the results were inconclusive; lab results are pending.

<u>October 10, 2019: Controlled purchase of suspected fentanyl from PEREZ and surveillance of</u>

**<u>Target Location #1</u>**

15.     **On October 10, 2019**, the CI conducted a controlled purchase of one "finger" (10 grams) of heroin/fentanyl from PEREZ.  **At 7:22 p.m.**, the CI placed an unrecorded call to PEREZ and ordered $250 worth of fentanyl. PEREZ told the CI to wait and PEREZ would call the CI when he was there. **At 7:43 p.m.**, PEREZ called and advised the CI to go to **Target Location #1**. Investigators provided the CI with $250 the CI drove to the area of **Target Location #1**. **At 7:50 p.m.**, the CI went into **Target Location #1** where the CI provided PEREZ $250 and PEREZ gave the CI one clear plastic bag containing a brown powdery substance.

16.     **At 7:53 p.m.,** the CI departed and drove to the predetermined meeting location and provided agents one plastic bag containing a brown powdery substance. The drugs field tested positive for fentanyl compound or methamphetamine; lab analysis is pending.

<u>Identification of Target Location #1</u>

17.     Target Location #1 is an elderly apartment complex run by the Methuen Housing Authority. Francis Covey is the current resident of this apartment. Covey has allowed PEREZ to deal narcotics out of this residence. **On September 25, 2019** investigators met with authorities from the Methuen Housing Authority and received consent to install a pole camera on their property to observe Target Location #1. The CI conducted four controlled drug purchases at Target Location #1. **On October 21, 2019,** investigators sought and obtained a search warrant to obtain the precise location information of PEREZ's telephone, the Target Cellular Device. This was the same telephone that the CI used to communicate with PEREZ and coordinate the controlled purchases. During the 30 days authorized by the search warrant, PEREZ's telephone was frequently in the area of Target Location #1. **On November 20, 2019**, agents sought and obtained a second search warrant for an additional 30 days of precise location information for PEREZ's telephone. Since the issuance of that warrant, the telephone was frequently located at Target Location #1. PEREZ has been observed at Target Location #1 during the same time periods that the precise location information for PEREZ's phone identified the phone at Target Location #1. In conjunction with the precise phone location data, the pole camera and physical surveillance has consistently revealed PEREZ and HOLLOWAY at Target Location #1. During multiple occasions while PEREZ and HOLLOWAY were at Target Location #1, and investigators observed (via the pole camera) HOLLOWAY making frequent trips out of the building of Target Location #1 only to return a few minutes later. They also observed HOLLOWAY coming and going when PEREZ was not at Target Location #1. Also, investigators observed numerous people who are not residents of the apartment complex frequently coming and going from the building of Target Location #1 while PEREZ and/or HOLLOWAY were present. Based upon my training and experience, this pattern of behavior is

consistent with drug distribution occurring at Target Location #1. Based upon the information

above and above-mentioned observations of HOLLOWAY and PEREZ at Target Location #1,

and the Acura sedan known to be used by PEREZ and HOLLOWAY seen at Target Location #1,

I believe that PEREZ and HOLLOWAY continue to use Target Location #1 as a place to commit

the Target Offenses.

<u>Identification of PEREZ's residence (Target Location #2)</u>

18.     Two of the controlled purchases occurred in the vicinity of Target Location #2.

During the first purchase in the vicinity of Target Location #2, PEREZ was on the telephone

with the FBI CI and described HOLLOWAY and his clothing to the CI. Immediately following

the controlled purchase, investigators observed HOLLOWAY walking from the buy location on

Hildreth Street towards Target Location #2. On the second controlled purchase in the vicinity of

Target Location #2, investigators observed HOLLOWAY exit the building of Target Location #2

directly before the controlled purchase and return to the direction of Target Location #2

following the controlled purchase. **On October 21, 2019,** investigators sought and obtained a

search warrant to obtain the precise location information of PEREZ's telephone, the Target

Cellular Device. This was the same telephone that the CI used to communicate with PEREZ and

coordinate the controlled purchases. During the 30 days authorized by the search warrant,

PEREZ's telephone was consistently in the area of Target Location #2 during the evening and

overnight hours. **On November 20, 2019**, agents sought and obtained a second search warrant

for an additional 30 days of precise location information for PEREZ's telephone. Since the

issuance of that warrant, the telephone has again consistently been at Target Location #2 during

the evening and overnight hours.  According to a law enforcement database and Registry of

Motor Vehicle records, PEREZ had a listed address of 22 Maple Street, Lawrence,

Massachusetts from 2008 until January 2019. Also according to law enforcement databases and

Registry of Motor Vehicle records, PEREZ's brother Anthony Perez ("A. Perez") also had the

previous address of 22 Maple Street, Lawrence, Massachusetts from 2008 until December 2019.

Both PEREZ and A. Perez still have 22 Maple Street as their listed address with the RMV, and I

believe that is not their most current address. Multiple law enforcement databases list Target

Location #2 as a current address for A. Perez since March 2019.  Based upon the information

above, the observations of HOLLOWAY leaving the building of Target Location #2, the Acura

sedan known to be used by PEREZ and HOLLOWAY seen at Target Location #2, PEREZ's

prior shared residence with A. Perez, I believe that PEREZ now resides at Target Location #2

and that PEREZ and HOLLOWAY use Target Location #2 as a place to facilitate the Target

Offenses.

### MANNER OF EXECUTION

19.     In my training and experience, I have learned that cellular phones and other cellular

devices communicate wirelessly across a network of cellular infrastructure, including towers that

route and connect individual communications.  When sending or receiving a communication, a

cellular device broadcasts certain signals to the cellular tower that is routing its communication.

These signals include a cellular device's unique identifiers.

20.     To facilitate execution of this warrant, law enforcement may use an investigative

device or devices capable of broadcasting signals that will be received by the Target Cellular

Device or receiving signals from nearby cellular devices, including the Target Cellular Device.

Such a device may function in some respects like a cellular tower, except that it will not be

connected to the cellular network and cannot be used by a cell phone to communicate with others.

The device may send a signal to the Target Cellular Device and thereby prompt it to send signals

13

that include the unique identifier of the device.  Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the Target Cellular Device's location, even if it is located inside a house, apartment, or other building.

21.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity.  Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices.  In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity.  These signals may include cell phone identifiers.  The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device.  To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

### *AUTHORIZATION REQUEST*

22.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.  The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

23.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance.  This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or

user of the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  There is reasonable necessity for the use of the technique described above, for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

24.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

25.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

26.     A search warrant may not be legally necessary to compel the investigative technique described in this affidavit.   Nevertheless, I submit this warrant application out of an abundance of caution.

Respectfully submitted,

_____

Tyler J. Sackett
Special Agent, Federal Bureau of
Investigation

Subscribed and sworn to before me on December 9, 2019.

_____

Hon. M. Page Kelley
United States Magistrate Judge

16

**ATTACHMENT A**

This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular device assigned phone number 978-983-1537.

## ATTACHMENT B

Pursuant to an investigation of Steven Perez, a/k/a "Stick" and Anthony Holloway for a violations of (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses"), this warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A by collecting and examining:

1. radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2. radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by the officers;

for a period of 30 days, during all times of day and night.  This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property.  The Court finds reasonable necessity for the use of the technique authorized above.  *See* 18 U.S.C. § 3103a(b)(2).

2

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re the use of a cell-site simulator to locate the cellular device assigned call number 978-983-1537 | Case No. 19-mj-6585-MPK |

## MOTION TO SEAL

The United States asks this Court to seal the search warrant application, supporting affidavit, search warrant, this motion, any ruling on this motion, and all related orders and paperwork until further order of this Court.  In support of this motion, the government states that the public disclosure of any of these materials at this juncture could jeopardize the government's ongoing investigation in this case.  The United States further asks, pursuant to General Order 6-05 that the United States Attorney, through undersigned counsel, be provided copies of all sealed documents which the United States Attorney has filed in this matter.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:  /s/ Philip C. Cheng
Philip C. Cheng
Assistant U.S. Attorney

Dated: December 9, 2019



allowed
Page Kelley
12/9/19